UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

United States of America

v.                                              Crim. Action No. 2:12-cr-65-wks-1

Kevin Harris

## <u>REPORT AND RECOMMENDATION</u>
(Docs. 106, 108)

Defendant Kevin Harris, proceeding *pro se*, moves under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence. (Doc. 106.) On April 12, 2013, a federal jury found Harris guilty on five of the seven counts in the Superseding Indictment: Count One, conspiring to distribute heroin and over 28 grams of cocaine base in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), 846; Counts Three through Five, knowingly and intentionally distributing either heroin or cocaine base on August 9, September 20, and September 22, 2011, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), 18 U.S.C. § 2; and Count Six, knowingly and intentionally possessing heroin and cocaine base with the intent to distribute those substances in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), 18 U.S.C. § 2. (Docs. 20, 63.) On January 30, 2014, Harris was sentenced to 151 months on the five counts, with each sentence to run concurrently. (Docs. 88, 90.) Following a retroactive amendment to the Sentencing Guidelines, on August 18, 2015, this Court resentenced Harris to 135 months on the five counts. (Doc. 103.)

Harris now contends that his sentence should be vacated based on two grounds: (1) his defense counsel, Attorney Thomas Sherrer, provided ineffective assistance of counsel by failing to seek dismissal of the Superseding Indictment for violations of the Speedy Trial Act (STA), 18 U.S.C. §§ 3161–3174, and for failing to adequately challenge other facets of the prosecution, as well as evidence admitted at trial and at sentencing; and (2), the Court erred when it imposed Harris's original sentence and when it resentenced Harris. (Doc. 106.) The government opposes Harris's Motion, arguing that his claims are barred both by the one-year statute of limitations set forth in 28 U.S.C. § 2255 and by other procedural requirements. (Docs. 108, 116.) The government further contends that, even if Harris's claims are not procedurally barred, they lack merit. (*Id*.)

Concluding that his claims are procedurally barred and that they are otherwise meritless, I recommend that Harris's § 2255 Motion be DENIED.

## Factual and Procedural Background

### I.    Charge and Arraignment

On April 19, 2012, the federal grand jury returned an Indictment charging Harris, also known as "Black," with six counts relating to a conspiracy to distribute cocaine base and heroin. (Doc. 1.) Count One of the Indictment charged Harris with conspiring to distribute heroin and over 28 grams of cocaine base in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), 846. (Doc. 1 at 1.) Counts Two through Five charged Harris with knowingly and intentionally distributing either heroin or cocaine base on August 9, September 20 (two counts), and September 22, 2011, in violation of 21

U.S.C. §§ 841(a)(1), (b)(1)(C), and 18 U.S.C. § 2.  (Doc. 1 at 2–5.)  Finally, Count Six

charged Harris with knowingly and intentionally possessing heroin and cocaine base

with the intent to distribute those substances in violation of 21 U.S.C. §§ 841(a)(1),

(b)(1)(C), and 18 U.S.C. § 2.  (Doc. 1 at 6.)

Attorney Sherrer was appointed to represent Harris pursuant to the Criminal

Justice Act.  (Doc. 6; Doc. 6-3.)  Harris was arraigned on July 24, 2012, in the District

Court of Vermont.  He pleaded not guilty to all of the charges set forth in the

Indictment.  (Doc. 8.)  By request of Attorney Sherrer, the Court ordered that pretrial

motions were to be filed by September 24, 2012.[1]  (Doc. 8.)

## II.    Pretrial Proceedings

### A.    Initial Scheduling Orders and Motions Deadlines

After Harris's arraignment, the Court issued a Criminal Pretrial Scheduling

Order reiterating that pretrial motions were to be filed by September 24, 2012, based

on Attorney Sherrer's request.  (Doc. 9 at 3.)  The Court found that this delay was

justified by the complexities of the case and the ends of justice.  (*Id*. at 4.)  The Court

further ordered that this period of delay would "be excludable in computing the time

in which the trial . . . must commence pursuant to the Speedy Trial Act."  (*Id*.)

Subsequently, on September 24, 2012, Attorney Sherrer filed a motion for

extension of time to file pretrial motions.  (Doc. 11.)  The Court found that the ends of

justice were served by granting this motion and set the new pretrial motions deadline

---

[1]  A review of the audio recording of the July 24, 2012 proceeding reveals that the Court orally set forth its reasons in support of the STA exclusion found at 18 U.S.C. § 3161(h)(7).  *See Zedner v. United States*, 547 U.S. 489, 506–07 (2006) (requiring specific findings set forth on the record).

for October 24, 2012.  (Doc. 12 at 1.)  The Court further noted that this additional

period would be excluded from computing time under the STA exclusion found at

18 U.S.C. § 3161(h)(7).  (*Id*.)

On October 29, 2012, Attorney Sherrer filed another motion for extension of

time, (Doc. 13); the Court granted this motion on October 31 for the same reasons as

his prior requests.  (Doc. 14.)  The Court set the new deadline for November 13, 2012,

and ordered that the delay would again be excludable in computing the time pursuant

to § 3161(h)(7).  (*Id*. at 1.)  Attorney Sherrer did not file any pretrial motions by the

November 13 deadline.

On November 16, 2012, the Court set the jury draw for January 8, 2013.

(Doc. 16.)

### B.    Preliminary Plea Negotiations

Relevant to the instant Motion, beginning sometime in September 2012, the

government and Attorney Sherrer engaged in extensive plea negotiations, despite

Harris maintaining that he was not interested in cooperating with the government.

(Doc. 115 at 2, ¶ 13; *id*. at 8, ¶¶ 46, 47.)  According to Attorney Sherrer, the

government took a firm approach in these negotiations based on Harris's prior

criminal record and the government's position that a death had resulted from heroin

distributed by Harris.  (*Id*. ¶ 47.)

Specifically, the government was not willing to offer a plea agreement that

exposed Harris to anything less than a 10-year mandatory minimum term of

imprisonment.  (*Id*. at 8–9, ¶ 48; Doc. 115-4.)  To reach this minimum threshold, the

government initially proposed that Harris plead guilty to two charges: Count One, which imposed a five-year mandatory minimum for conspiring to distribute cocaine base and heroin in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), 846, and an as-yet-unfiled count, possessing a gun in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i), which, by statute, required the imposition of a consecutive five-year mandatory minimum term of imprisonment. (Doc. 115-4; Doc. 116-4.) Because a conviction under § 924(c) required imposition of a five-year consecutive mandatory minimum term, the mandatory minimum sentence under the government's first proposal was 10 years.

If Harris refused the offer, the government indicated that it would file both a superseding indictment charging Harris with distributing controlled substances with death resulting and an information under 21 U.S.C. § 851 notifying Harris of the government's intent to seek a sentencing enhancement based on Harris's prior felony drug convictions. (Doc. 115-4.) According to Attorney Sherrer, a conviction for these offenses would have potentially exposed Harris to either a 15-year or 20-year mandatory minimum term of imprisonment. (*Id.*)

Attorney Sherrer sought a revised plea offer in which the government would forego seeking a 10-year mandatory minimum. (Doc. 115 at 9, ¶ 51.) As part of his efforts, Attorney Sherrer met with both the Assistant United States Attorney prosecuting Harris and the United States Attorney on December 12, 2012. (*Id.* ¶ 52.) Attorney Sherrer subsequently gathered more information regarding Harris's personal background in order to offer this background as mitigating evidence. (*Id.*)

Attorney Sherrer then wrote to the government attorneys, arguing that Harris's tragic

personal history justified a five-year mandatory minimum term, not a 10-year term.

(Doc. 115-5 at 2–4.)

### C.    Section 851 Notice and Superseding Indictment

Attorney Sherrer's efforts aimed at convincing the government to reduce its

plea offer were unsuccessful.  On December 14, 2012, the government filed an

information pursuant to 21 U.S.C. § 851 notifying Harris of its intent to seek a

sentencing enhancement based on Harris's two prior felony drug convictions in

New York state court.  (Doc. 17.)

At a December 17, 2012 pretrial conference, the Court discussed this § 851

notice with Harris and Attorney Sherrer and informed Harris that, in the event of a

conviction, the notice of prior conviction under § 851 exposed him to a possible 10-year

mandatory minimum sentence and that the Court would have no discretion to

sentence Harris below that minimum.  (Doc. 104 at 3–4.)  The Court also noted that

the government had indicated that it was contemplating charging Harris with

possessing a gun in furtherance of drug trafficking crime in violation of 18 U.S.C.

§ 924(c)(1)(A)(i).  (*Id*. at 4.)  The Court explained to Harris that a conviction arising

under 18 U.S.C. § 924(c)(1)(A)(i) would expose Harris to an additional five-year

consecutive mandatory minimum term.  (*Id*.)  Thus, along with the 10-year mandatory

minimum for the § 851 notice, Harris's exposure at trial would be at least a 15-year

mandatory minimum sentence.  (*Id*.)  Finally, the Court noted that the government

had indicated that it was also contemplating charging Harris with the death resulting

6

from the distribution of controlled substances, which could further increase Harris's exposure to a greater mandatory minimum sentence. (*Id.* at 4–5.) Harris stated that he had no confusion about these potential sentences and, through Attorney Sherrer, agreed to keep the January 8, 2013 trial date in place. (*Id.*)

On January 3, 2013, the grand jury returned a Superseding Indictment charging Harris with the original six counts and an additional count. (Doc. 20.) The new count—Count Seven—charged Harris with violating 18 U.S.C. § 924(c)(1)(A), possessing a gun in furtherance of a drug trafficking crime.[2] (Doc. 20 at 7.) The arraignment on the Superseding Indictment was set for January 8, 2013, immediately prior to the scheduled jury draw. (Doc. 21.)

### D.    Final Plea Offers

On January 4, 2013, the government extended to Harris two distinct final plea offers based on the § 851 notice and the new firearms charge alleged in Count Seven of the Superseding Indictment. (*See* Docs. 115-6, 115-7, 116-2.) Under the first offer, Harris would plead guilty to Count One, conspiring to distribute heroin and 28 grams or more of cocaine base in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(B). (Doc. 115-6 at 1, ¶ 1.) Harris would also be compelled to agree to the sentencing enhancement under 21 U.S.C. § 841(b)(1)(B) for offenders with a prior felony drug conviction, exposing Harris to a 10-year mandatory minimum. (*Id.* ¶ 2.) The second plea offer also exposed Harris to a 10-year mandatory minimum; the offer retained the

---

[2] Despite their prior statements during plea negotiations, the government did not charge Harris with distributing prohibited substances with death resulting in the Superseding Indictment. (*See generally* Doc. 20.)

conspiracy-to-distribute charge under Count One but replaced the § 841(b)(1)(B) sentencing enhancement for Harris's prior felony drug conviction with a plea of guilty to Count Seven, possessing a firearm in furtherance of a drug trafficking crime under 18 U.S.C. § 924(c)(1)(A)(i).  (Doc. 115-7 at 1, ¶ 1.)  After discussing both offers with counsel, Harris rejected both plea offers.  (Doc. 115 at 10, ¶ 54; Doc. 116-3.)

### E.    Arraignment and Jury Draw Continuance

Harris was arraigned on the Superseding Indictment on January 8, 2013.  (Doc. 96.)  Prior to the arraignment hearing, however, the U.S. Marshals brought Harris into the courtroom while shackled.  (Doc. 96 at 2; Doc. 115 at 5, ¶ 34.)  Several prospective jurors were waiting in the courtroom for the jury draw and witnessed Harris shackled.  (Doc. 115 at 5, ¶ 34.)  To avoid this potential prejudice to Harris, the Court granted Attorney Sherrer's motion to continue the jury draw.  (*Id.* ¶ 35; Doc. 96 at 3.)  The Court continued the jury draw for 30 days and tolled the speedy trial clock during these 30 days in the interests of justice, setting forth its factual finding on the record consistent with 18 U.S.C. § 3161(h)(7).  (Doc. 96 at 20.)

The transcript of the arraignment also reveals that, while Harris was present in court, the government carefully explained the two plea offers that had been extended to Harris, and Attorney Sherrer observed that the plea offers "ha[d] been given considerable thought and discussion."  (Doc. 96 at 5–6, 13.)  The Court ascertained from Harris directly that the plea offers had been communicated to him by counsel.  (*Id.* at 23.)  Harris acknowledged this communication and stated that he had rejected the offers and wished to exercise his right to trial by jury.  (*Id.*)

Furthermore, at the arraignment, the presiding district judge discussed rescheduling the trial. (*Id.* at 3.) During this discussion, the Court paid careful attention to the requirements of the STA. (*Id.* at 3–4, 17–19.) Upon inquiry, the Court was informed that only 17 days remained on the 70-day speedy trial clock. (*Id.* at 17–19.) The Court proposed that, with an appropriate STA exclusion, it could extend to Harris a choice regarding the timing of his trial: either Harris could move forward with another district judge within the next 30 days or, if Harris wished to continue with the same presiding judge, he could wait until early March for his trial. (*Id.* at 18–19; Doc. 115 at 5–6, ¶ 36). Ultimately, Harris chose to remain with the same presiding judge and the jury draw was set for March 6, 2013, with the trial to commence on March 12. (Doc. 96 at 18–19; Doc. 115 at 5–6, ¶ 36; *see also* Doc. 27.)

Subsequently, the government filed an unopposed motion to exclude the days from February 6, 2013, to the jury draw on March 6, 2013, from being counted under the STA. (Doc. 28.) The Court granted this motion, again concluding that the ends of justice outweighed the interests of the public and Harris in a speedy trial under 18 U.S.C. § 3161(h)(7). (Doc. 29.)

Then, on February 15, Attorney Sherrer moved to continue the jury draw, (Doc. 30); the Court granted the motion and excluded the days from March 6 until the new jury draw date of April 2, 2013, from being counted in the speedy trial computations. (Doc. 31 at 1–2.) Ultimately, Harris's jury draw commenced on April 9, 2013, and his trial began on April 10, 2013. (Docs. 56, 59.)

### F.    Pretrial Motions

Throughout the proceedings, Attorney Sherrer filed a number of pretrial motions.[3] As relevant to the instant § 2255 Motion, on February 22, 2013, Sherrer filed his first motion to suppress.  (Doc. 32.)  In the motion, along with challenging evidence derived in a search of a Barre, Vermont residence, Attorney Sherrer questioned the source of a photograph of Harris used in assembling a photographic array.  (Doc. 32 at 15–16.)  The photographic array had been presented to Anthony Miller, a coconspirator and trial witness, who identified Harris as "Black."  (*Id.* at 15.) Because the identity of "Black" had not been known to the government for a substantial period of time, Sherrer sought an order compelling the government to disclose the reason it had included Harris in the array shown to Miller.  (*Id.* at 16.) Attorney Sherrer further stated that, once the source of the photograph was known, the constitutionality of Miller's identification might be challenged.  (*Id.*)

In a written opinion, the Court denied Sherrer's motion to compel disclosure of the source of the photograph.  (Doc. 41 at 16–17.)  The Court concluded that, "[a]ssuming that the defendant does not contest that the photograph used to identify him was in fact him, how the government obtained the photograph is irrelevant."  (*Id.* at 17.)

---

[3] As illustrative examples, Attorney Sherrer filed the following motions: Motion Seeking in Camera Inspection and Disclosure of USPO Reports, (Doc. 44); Motion in Limine for an Order Excluding Video Recording, (Doc. 45); and, a Second Motion in Limine to Preclude Evidence Related to any Alleged Drug Trafficking in New York, Chittenden County as well as any activity related to Linda Barbour, (Doc. 47); and, a Motion to Suppress Sarah Lucas's Identification.  (Doc. 55.)

### G.   Pretrial Motions Hearing

During a motions hearing on April 8, 2013—two days before the trial—Attorney Sherrer disclosed two strategic disagreements that he was having with Harris.  (Doc. 97 at 46–47.)  Harris wanted Sherrer to file a motion to dismiss based on alleged violations of Harris's speedy trial rights and another motion to suppress certain out-of-court identifications made by a potential trial witnesses, Sarah Lucas.  (*Id.*)  Although Attorney Sherrer did not believe that either motion had merit, at Harris's behest, he raised the issues before the Court.  (*Id.*)

The Court asked Harris to put his concerns on the record.  (*Id.* at 47.)  Harris stated that he understood that "any time that was afforded to the government does not, like, go against my speedy trial time . . . and the time for me to have to go to trial . . . like[] motion practice or whatever."  (*Id.* at 48.)  But Harris still contended that the speedy trial clock had expired.  (*Id.* at 51–52.)  In response, the Court generally explained tolling to Harris and concluded that there was no formal motion to dismiss for speedy trial violations.  (*Id.* at 50–52.)  Next, Harris asked about challenging an identification that occurred more than 20 months after the alleged drug sale.  (*Id.* at 57.)  The Court determined that any potential problem with the identification could be addressed with a vigorous cross-examination at trial.  (*Id.* at 57–58.)

## III.  Trial

The trial began in the afternoon of April 10, 2013, after the Court addressed several additional outstanding motions.  (Doc. 58; *see generally* Doc. 83.)

11

During the three-day trial, the government presented tangible evidence and the testimony of law enforcement personnel and several coconspirators to establish that Harris, also known as "Black," was an armed and experienced drug trafficker who, along with the coconspirators, brought crack cocaine and heroin from New York City to Barre, Vermont, where "Black" sold the drugs, including on the occasions charged in the Superseding Indictment.  (Doc. 83 at 49–50.)

The testimony of Anthony Miller, one of the coconspirators, is pertinent to the present § 2255 Motion.  Miller cooperated with the government pursuant to a plea agreement.  (Doc. 85 at 29–35.)  Prior to trial, Miller twice identified Harris from photographs.  The first time, on March 27, 2012, Miller was shown a single photograph taken from a seized iPad and he was asked by law enforcement if he could identify the man in the photo.  (Doc. 116-1 at 51–52.)  He identified the man as "Black," an alias that Harris used.  (*Id*.)  The second identification occurred as part of a photo array presented to Miller on April 16, 2012; Miller again identified the photo of Harris as "Black" in the lineup.  (*Id*. at 51 n.4; Doc. 32 at 15–16, Doc. 32-6.)

During the trial, Miller testified that, when he got out of prison in July 2011, he returned to his home in the Bronx, where he met "Black."  (Doc. 85 at 35–36.)  According to his testimony, he had known "Black" for a "[c]ouple of years."  (*Id*. at 35.)  "Black" told Miller that he "had a spot out of town" in Barre, Vermont, where they could make money selling drugs.  (*Id*. at 36.)  Miller then explained that he and "Black" began traveling to Barre to sell heroin and crack cocaine.  (*Id*. at 37–38.)  They took multiple trips by bus for this purpose.  (*Id*. at 39–41.)  At other times, Miller took

the bus with other conspirators and "Black." (*Id.* at 42–45.) Once the drugs were transported to Barre, Miller and "Black" would chop and bag the heroin and crack cocaine to sell on the streets. (*Id.* at 41.) Finally, in the course of his testimony, Miller identified "Black's" voice on a recording, identified "Black" in video surveillance, and Miller identified "Black" as Harris in the courtroom. (*Id.* at 58, 67, 68.)

Similarly, numerous other witnesses identified Harris as "Black" during the trial and offered additional testimony supporting the government's case: Rebecca O'Neill, who allowed Harris and Miller and another coconspirator stay at her Barre apartment while they were selling crack cocaine and heroin, (*see* Doc. 83 at 235–37; Doc. 84 at 30–31); John Wiley, who traveled with "Black" to New York City to acquire heroin, (*id.* at 83–94); and Lisa Barbour, who also transported crack cocaine and heroin with "Black." (*Id.* at 145–57.)[4] In addition, Detective Shawn Loan testified that the Vermont State Police accomplished a series of controlled purchases of drug evidence from "Black" and his coconspirators. (Doc. 83 at 119.) Specifically, a confidential informant, Sarah Lucas, purchased heroin and crack cocaine on August 9, September 20, and September 22, 2011. (*Id.* at 120–22; 148–156.) Finally, Detective Loan testified that Sarah Lucas had identified Harris as "Black" from a photographic lineup prior to trial. (*Id.* at 160–61.) Lucas herself described her purchases of drug evidence and authenticated recordings of the buys from "Black". (*Id.* at 204–18.)

---

[4] Other witnesses also established the existence of the conspiracy and the means and methods employed by the conspirators. Dondre Chisom, testifying pursuant to a plea agreement, described in detail extensive drug dealing by Black and others during the conspiracy. (Doc. 84 at 165–86)

On April 12, 2103, the jury found Harris guilty on five counts: Count One, conspiring to distribute over 28 grams of cocaine base and heroin in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), 846; Counts Three through Five, knowingly and intentionally distributing either heroin or cocaine base on August 9, September 20, and September 22, 2011, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2; and Count Six, knowingly and intentionally possessing heroin and cocaine base with the intent to distribute those substances in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2.  (Doc. 63.)  The jury found Harris not guilty on Count Two and Count Seven.  (*Id.*)

## IV.   Sentencing

### A.   Original Sentence

A presentence report (PSR) was submitted to the Court in anticipation of sentencing.  The PSR noted that, based on the 21 U.S.C. § 851 notice of prior conviction and the drug quantity allegation set forth in Count One, Harris's Count One conviction carried a 10-year mandatory minimum with a maximum of life under 21 U.S.C. § 841(b)(1)(B),and that Counts Three through Six, the maximum term of imprisonment was 30 years pursuant to 21 U.S.C. § 841(b)(1)(C).  (PSR at 22, ¶ 83.)

For the Sentencing Guideline calculation, the PSR began with a base offense level of 30.  (*Id.* at 13–14, ¶ 39.)  The PSR added two levels to this base offense level because Harris possessed a dangerous weapon and two additional levels because Harris made a credible threat to use violence.  (*Id.* at 14, ¶ 40 (citing USSG § 2D1.1(b)(1), (2).)  Finally, the PSR determined that Harris was a career offender

under USSG § 4B1.1 and added three additional levels because Harris had at least two prior felony controlled-substance offenses. (*Id.* ¶ 45.) Thus, Harris's adjusted offense level was 37. (*Id.*) The PSR further concluded that Harris had a criminal history score of 11. (*Id.* at 18, ¶ 59.) This score included two points for a prior conviction for false personation in New York. (*Id.* at 16, ¶ 52.) Generally, 11 criminal history points would have placed Harris in a Criminal History Category (CHC) of V, but the PSR concluded that, because of Harris's status as a career offender, the CHC was VI. (*Id.* ¶ 59.) With a total offense level of 37 and a CHC of VI, Harris faced an advisory Sentencing Guideline imprisonment range of 360 months to life. (*Id.* at 22, ¶ 84.)

On January 27 and January 30, 2014, Harris appeared for sentencing proceedings. (Docs. 86, 88, 94.) In response to the Court's inquiry, Harris acknowledged that he had reviewed the PSR (Doc. 94 at 4); and, although Harris stated that he found some factual mistakes, he admitted that he had discussed the errors with Attorney Sherrer. (*Id.* at 4–5.) The Court next considered a number of issues raised by Sherrer regarding the advisory Sentencing Guidelines. (*Id.* at 11.) In doing so, the Court heard witness testimony and reviewed several documents that had been admitted into evidence, including a New York certificate of disposition indicating that, as of February 6, 2013, Harris's 2008 convictions were recorded in the State of New York's court records. (*Id.* at 11, 137, *see generally id.* 37–130; Doc. 82-1.)

After hearing this testimony and reviewing the evidence, the Court made several adjustments to Harris's adjusted offense level. First, based on the parties'

agreement, the Court concluded that Harris was not a career offender under the advisory Sentencing Guidelines. (Doc. 94 at 11.) Next, the Court set the base offense level at 30 based on the amount of drugs described in the testimony. (*Id.* at 181, 237.) To this base level, the Court added a two-level enhancement under USSG § 2D1.1(b)(1) because the testimony establish that Harris had been in possession of a firearm. (*Id.* at 182, 237.) But the Court found that the testimony did not credibly established that Harris had made a threat and, as a result, the Court did not add a two-level enhancement under § 2D1.1(b)(2). (*Id.* at 183–84, 237.) Thus, the Court determined that Harris's adjusted offense level was 32. (*Id.* at 237.)

The Court also adjusted Harris's criminal history score, concluding that the testimony and evidence supported the assessment of only seven points. (*Id.* at 183–85, 237.) Of these seven points, two included Harris's prior conviction for false personation in New York. (*Id.* at 10, 158.) Attorney Sherrer agreed with the assessment of these two points at the sentencing hearing (*id.* at 157–58), but he stated for the record that Harris disputed the two points assessed based on the length of his imprisonment for the false personation conviction. (*Id.* at 157.) Ultimately, the Court noted that Harris "didn't raise an objection to the two points" (*see id.* at 179), and applied the two points along with five other points, which totaled seven criminal history points and resulted in a CHC of IV. (*Id.* at 185, 237.)

The Court then heard argument from defense counsel and the government regarding the statutory sentencing factors found at 18 U.S.C. § 3553(a). (*Id.* at

16

185–201, 216–26.)  Attorney Sherrer advocated for the 10-year mandatory minimum sentence, pointing to Harris's troubled personal history and upbringing, as well as his youth.  (*Id.* at 192–93, 201.)  The government sought a 210-month term of imprisonment, or 17-and-a-half years, arguing that Harris was not motivated by addiction and that he directed the conspiracy solely to enrich himself by using Vermont addicts.  (*Id.* at 216–17.)  The Court reviewed the sentencing factors set forth in 18 U.S.C. § 3553(a) and determined that a "modest adjustment" was appropriate and the Court reduced Harris's offense level to 31.  (*Id.* at 236–37.)  With a CHC of IV, this offense level adjustment yielded a recommended sentencing range of 151–188 months.  (*Id.* at 236.)

Prior to imposing Harris's sentence, the Court confirmed Harris's admission to two prior felony-drug convictions consistent with 21 U.S.C. § 851.  (*Id.* at 228–29.) Although Harris claimed that the felonies had been removed from his record, (*id.*), the Court noted on the record that Harris's affirmation was sufficient under 21 U.S.C. § 851(b) to establish the prior convictions and to impose the 10-year mandatory minimum under 21 U.S.C. § 841(b)(1)(B) for offenders with a second felony drug offense.  (*Id.* at 229.)

Ultimately, the Court sentenced Harris to 151 months on all counts, to run concurrently.  (*Id.* at 237.)

## B.    Resentencing

Subsequently, Amendment 782 to the Sentencing Guidelines retroactively amended the drug quantity table in USSG § 2D1.1(c), reducing the offense level for all

controlled substance offense.  This meant that Harris's base offense level was reduced from 30 to 28.  (*Cf.* PSR at 13–14, ¶ 39.)  With the two-level enhancement for firearm possession the original sentencing court had applied, Harris's new total offense level was 30.  This yielded a new recommended sentencing range of 135–168 months.  Based on this amended Guideline range, the Court issued an order on August 17, 2015 resentencing Harris to 135 months, with the reduction effective November 1, 2015.  (*See* Doc. 103.)

To accomplish the resentencing, the Court utilized a two-page form entitled Order Regarding Motion for Sentence Reduction Pursuant to 18 U.S.C. § 3582(c)(2), a form issued by the Administrative Office of the United States Courts and labeled AO 247.  An AO 247 form is a two-page order, but only page one of the Order is found in the public record of the Court in order to protect inmate security and safety.  (*Id.*)  Page two of the AO 247 Order is used only when the motion is to be granted and requires the resentencing court (1) to set forth its determination of the revised Sentencing Guideline calculation and (2) to state the new sentence relative to the amended Sentencing Guideline range.  Page two also permits the resentencing court to state additional comments.[5]  In the Order reducing Harris's sentence, the Court noted on page one that Harris's prior 151-month sentence was reduced to 135 months, "[u]pon motion of the court under 18 U.S.C. § 3582(c)(2) for a reduction in the term of imprisonment imposed based on a guideline sentencing range that has subsequently

---

[5] This second page of AO Form 247 is maintained by the United States Probation Office.  It has been examined by the undersigned.

been lowered and made retroactive." (*Id.*)  The Court further stated on page one that it had considered the factors set forth in 18 U.S.C. § 3553(a), (*id.*), and, on page two, the Court engaged in the requisite Sentencing Guideline calculation and provided some brief commentary in support of granting the motion to reduce the sentence and the 135-month sentence.  Although the Order noted the Court's consideration of the § 3553(a) statutory sentencing factors, that consideration was not set forth in any detail.  (*Id.*)

## V.    Direct Appeal

Attorney Sherrer timely filed an appeal of Harris's conviction and sentence. (Doc. 91.)  On appeal, Harris was assigned new counsel; appellate counsel filed a brief challenging Sarah Lucas's out-of-court identification of Harris and contending that the special verdict form was impermissible.  *See* Brief for Defendant-Appellant, *United States v. Harris*, 598 F. App'x 44 (2d Cir. 2015) (No. 14-458, ECF No. 31).

Harris also submitted a *pro se* brief accompanying his appellate counsel's brief. Appellant's Pro Se Supplemental Brief, *United States v. Harris*, 598 F. App'x 44 (No. 14-458, ECF No. 60).  In his brief, Harris raised six additional issues.  (*Id.* at 4, Table of Contents.)  Two of these claims are relevant to the instant § 2255 Motion.  First, he claimed that his trial violated the Speedy Trial Clause of the Sixth Amendment[6] and that his trial violated the STA, noting that "the speedy trial clock had expired."  (*Id.* at 28–30.)  Second, he claimed "law enforcement used a photographic identification

---

[6] Harris actually argued that his "5th Amendment Right to Speedy Trial Was Violated," (No. 14-458, ECF No. 60 at 28); however, the Court concludes Harris was relying on the Sixth Amendment speedy trial protections, as opposed to the Fifth Amendment.

procedure that was impermissibly suggestive" when, out of court, the coconspirator Andrew Miller identified Harris as "Black." (*Id.* at 32.)

On May 7, 2015, the Second Circuit affirmed Harris's conviction and sentence. In its summary order, the Second Circuit briefly addressed and rejected appellate counsel's arguments. *Harris*, 598 F. App'x at 44–45. The circuit court did not specifically analyze the issues raised by Harris, instead noting that the court "considered Harris's pro se arguments and consider[ed] them to be without merit." *Id.* at 45 n.2.

## VI.    § 2255 Motion

On March 31, 2017, Harris filed the instant § 2255 Motion to Vacate, Set Aside, or Correct Sentence. (Doc. 106.) In his Motion, Harris contends that his counsel's performance fell short of reasonably effective representation in four ways: (1) Attorney Sherrer failed to file a motion to dismiss based on violations of the Speedy Trial Clause and the STA (*id.* at 8–12); (2) Sherrer provided erroneous advice regarding the plea offers advanced by the government (*id.* at 12–13); (3) because of Sherrer's purported ignorance of the law relating to impermissibly suggestive photographic arrays, he failed to file a motion to suppress Anthony Miller's out-of-court identification of Harris as "Black" (*id.* at 14–16); and (4), Attorney Sherrer failed to investigate and challenge Harris's prior felony drug offenses, which were used to enhance his sentence. (*Id.* at 18–19.) Harris also argues that the Court misapplied the Sentencing Guidelines when it assessed him two criminal history points for the prior false impersonation conviction in New York. (*Id.* at 16–18.) Finally, Harris

20

claims that the Court erred when it resentenced Harris without considering the factors set forth in 18 U.S.C. § 3553(a).  (*Id.* at 20–21.)

On April 21, 2017, the government filed a Motion to Dismiss Harris's § 2255 Motion, asserting that his claims are barred by the one-year statute of limitations set forth in the Antiterrorism and Effective Death Penalty Act of 1996(AEDPA), Pub. L. No. 104-132, § 105, 110 Stat. 1214 (codified as 28 U.S.C. § 2255(f)).  (*See generally* Doc. 108.)  Subsequently, on November 7, 2017, the government filed a Supplemental Memorandum addressing the substance of Harris's six claims and principally arguing that each claim lacks merit.  (Doc. 116.)  Attorney Sherrer has also filed an Affidavit responding to Harris's assertions concerning the claims raised in the § 2255 Motion. (Doc. 115.)

As discussed below, the statute of limitations and other procedural requirements bar the various claims that Harris raises in his § 2255 Motion.  Even if Harris could overcome these procedural hurdles, his claims are meritless.

## Analysis

As described above, Harris generally contends in his § 2255 Motion that his counsel provided ineffective representation and that the Court erred in imposing his original sentence and in resentencing him.  In assessing the specifics of these arguments, Harris is entitled to a liberal construction of his pleadings, which "should be interpreted 'to raise the strongest arguments that they suggest.'"  *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.1996) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790

(2d Cir. 1994)).  Even so, a habeas petitioner such as Harris cannot rely on "[a]iry

generalities, conclusory assertions and hearsay statements." *United States v. Aiello*,

814 F.2d 109, 113 (2d Cir. 1987).  Rather, Harris must allege "specific facts which he

is in a position to establish by competent evidence." *LoCascio v. United States*,

395 F.3d. 51, 57 (2d Cir. 2005) (quoting *Dalli v. United States*, 491 F.2d 758, 761 (2d

Cir.1974)).  Nor does Harris's *pro se* status exempt him from "relevant rules of

procedural and substantive law." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471,

477 (2d Cir. 2006) (internal quotation marks omitted)).

## I.    Statute of Limitations

As an initial matter, the statute of limitations set forth in 28 U.S.C. § 2255(f)

bars Harris's claims.  The one-year statute of limitations runs from the latest of:

   (1) the date on which the judgment of conviction becomes final;

   (2) the date on which the impediment to making a motion created by
   governmental action in violation of the Constitution or laws of the United
   States is removed, if the movant was prevented from making a motion by
   such governmental action;

   (3) the date on which the right asserted was initially recognized by the
   Supreme Court, if that right has been newly recognized by the Supreme
   Court and made retroactively applicable to cases on collateral review; or

   (4) the date on which the facts supporting the claim or claims presented
   could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f)(1)–(4).  The Supreme Court has held that a conviction becomes

final on the date when the time for filing a petition for writ of certiorari expires, or

90 days after the court of appeals entered judgment.  *Clay v. United States*, 537 U.S.

522, 532 (2003) ("We hold that, for federal criminal defendants who do not file a

petition for certiorari with this Court on direct review, § 2255's one-year limitation period starts to run when the time for seeking such review expires.").

In this case, the Second Circuit entered judgment affirming Harris's conviction on May 7, 2015.[7]  (Doc. 101.)  Thus, the statute of limitations began running 90 days later, on August 5, 2015 when the period for filing a petition for a writ of certiorari expired.  Harris did not file the instant § 2255 Motion until March 31, 2017, (*see* Doc. 106), seven months after the statute of limitations expired.  Harris does not provide any reason for this delay or assert that the statute of limitations began running at a different date.  Nor does he argue that the doctrine of equitable tolling has any application to his Motion.  Thus, his § 2255 Motion is barred by the statute of limitations.  As a result, the government's Motion to Dismiss the § 2255 Motion as having been filed beyond the statute of limitations (Doc. 108) should be GRANTED.

## II.    Ineffective Assistance of Counsel

### A.    Standard of Review

To establish ineffective assistance of counsel, a petitioner must show that (1) counsel's representation fell below "an objective standard of reasonableness" under

---

[7]  The fact that on August 17, 2015 Harris benefitted from a sentence reduction pursuant to the authority of 18 U.S.C. § 3582(c)(2) does not change the analysis.  It is well settled that a § 3582(c)(2) sentence modification, whether granted or denied, does not restart the § 2255(f)(1) limitation period. *See United States v. Preyear*, Civil Action No. 10–0280–KD; Criminal Action No. 05–267–KD–N, 2010 WL 4026087 at *1–2 (S.D. Ala. Sept. 22, 2010).  18 U.S.C. § 3582(b) makes it clear that, notwithstanding the fact that a sentence may be subject to modification under § 3582(c)(2), "a judgment of conviction that includes such a sentence constitutes a final judgment for all other purposes." *United States v. Dixon*, Criminal Action No. 99–525–03; Civil Action No. 09–1606, 2009 WL 1559947 at *3 (E.D. Pa. June 3, 2009); *See Gomez v. United States*, Civil Action No. 3:09–CV–0073–G; Criminal Action No. 3:04–CR–253(03)–G ECF, 2009 WL 1309338 at *2 (N.D. Tex. May 11, 2009) (order reducing sentence pursuant to § 3582(c)(2) "did not alter the date on which [the] judgment of conviction became final under § 2255(f)(1)").

"[p]revailing norms of practice"; and (2) "affirmatively prove prejudice" by showing that there is a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 693–94 (1984).

To establish *Strickland*'s first prong, the petitioner must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The court must evaluate these acts or omissions based on the totality of the circumstances. *Id.* This review is highly deferential and the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. In particular, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable" but "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91; *cf. Rompilla v. Beard,* 545 U.S. 374, 389 (2005) (concluding it was unreasonable for defense lawyer to fail to examine defendant's prior-conviction file, despite knowing prosecutors intended to quote victim's testimony from file). Ultimately, the goal is not to judge counsel's performance in hindsight or to second-guess counsel's decisions, but to determine whether the performance produced an unreliable outcome. *Strickland*, 466 U.S. at 687, 689–91; *see also Kieser v. New York*, 56 F.3d 16, 18 (2d Cir. 1995) ("Actions or omissions by counsel that 'might be considered sound trial strategy' do not constitute ineffective assistance." (internal quotation marks omitted)).

24

Even if the conduct of counsel was found to be professionally unreasonable, *Strickland*'s second prong requires the petitioner establish prejudice. *Strickland*, 466 U.S. at 694. To demonstrate prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*; *see also Romero v. United States*, 933 F. Supp. 2d 528, 532 (S.D.N.Y. 2013) ("'Reasonable probability' is evaluated based on the likelihood that, had counsel not foregone the alleged action, the trial outcome would have been different." (quoting *Hill v. Lockhart*, 474 U.S. 52, 59–60 (1985)).) In assessing whether counsel's performance affected the outcome of a proceeding, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

## B.    Speedy Trial Claim

Harris first claims that his counsel was ineffective for failing to file a motion to dismiss the Superseding Indictment on the grounds that the pretrial process violated the STA and the Speedy Trial Clause of the Sixth Amendment. (Doc. 106 at 8.) But, as explained below, the mandate rule bars his speedy trial claims and, in any case, the claims are without merit. Because his counsel had no obligation to raise meritless arguments, Harris cannot establish that his counsel was ineffective for failing to argue that the Superseding Indictment should be dismissed because of a speedy trial violation.

### 1.    Mandate Rule

First, Harris's speedy trial claims are barred by the mandate rule.  Under this rule, a § 2255 petitioner "may not relitigate questions which were raised and considered on direct appeal, including questions as to the adequacy of counsel." *Yick Man Mui v. United States*, 614 F.3d 50, 55 (2d Cir. 2010) (internal quotation marks omitted).  "The mandate rule prevents re-litigation in the district court not only of matters expressly decided by the appellate court, but also precludes re-litigation of issues impliedly resolved by the appellate court's mandate." *Id.* at 53.  Moreover, even if the appellate court does specifically analyze all of the issues in its opinion, an issue is considered to be raised and addressed if the appellate court indicates in its opinion that it considered all of the arguments and dismissed them without merit.  *See Klein v. United States*, No. 09 CV 10048(BSJ), 2012 WL 5177493, at *3 (S.D.N.Y. Oct. 17, 2012); *see also United States v. Pitcher*, 559 F.3d 120, 124 (2d Cir. 2009) (rejecting petitioner's § 2255 ineffective-assistance claims because they were "premised on the same facts and rest on the same legal ground" as the argument made on direct appeal).

In this case, on direct appeal, Harris submitted a *pro se* brief accompanying his appellate counsel's brief.  Appellant's Pro Se Supplemental Brief, *Harris*, 598 F. App'x 44 (No. 14-458, ECF No. 60).  In Harris's brief, he plainly raised a claim that his trial violated the Speedy Trial Clause of the Sixth Amendment[8] and he argued that he met each of the factors articulated in *Barker v. Wingo,* 407 U.S. 514 (1972).  *Id.* at 30.  He

---

[8]  As noted above, Harris mistakenly argued that his "5th Amendment Right to Speedy Trial Was Violated." (No. 14-458, ECF No. 60 at 28).

also claimed that his trial violated the STA, noting that "the speedy trial clock had expired." *Id.* In its summary order, the Second Circuit did not specifically address these issues, instead noting that the court "considered Harris's *pro se* arguments and consider[ed] them to be without merit." *Harris*, 598 F. App'x at 45 n.2. This summary dismissal is sufficient for this Court to conclude that the Second Circuit considered and decided the speedy trial issues raised by Harris in his § 2255 Motion. Thus, because Harris's speedy trial claims were previously adjudicated in the Second Circuit, the mandate rule bars the claims from collateral review.

### 2.    Speedy Trial Act

Even if Harris's speedy trial claims were not barred by the mandate rule, they would not succeed on the merits. His first speedy trial claim is that he was not brought to trial within 70 days as required by the STA, and that, as result, his counsel should have moved to dismiss the Superseding Indictment. (Doc. 106 at 8.) Given the statutory exclusions to the 70-day period, however, Harris was brought to trial within the 70-day time period. Specifically, according to this Court's calculations, 17 days remained of the 70-day period when his trial began on April 9, 2013, and, thus, Harris cannot establish a violation of the STA. Further, because he cannot demonstrate such a violation, he cannot prove that he was prejudiced under *Strickland* or that Attorney Sherrer was ineffective for failing to raise a claim that was unlikely to succeed.

Under the STA, when a defendant pleads not guilty, the trial must "commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the

court in which such charge is pending, whichever date last occurs." *Id.* § 3161(c)(1). Certain periods of delay must be excluded from the 70-day period. *See generally id.* § 3161(h)(1). As relevant to this case, the 70-day period does not include the following: delay resulting from any pretrial motions, as measured from the time of filing to the disposition of the motion, *id.* § 3161(h)(1)(D); and, any period of delay resulting from a continuance, if the judge grants the continuance on the basis of his findings that the ends of justice served by the continuance outweigh the public and the defendant's best interests in a speedy trial. *Id.* § 3161(h)(7)(A).

In this case, the 70-day period began on July 24, 2012, the day Harris was arraigned in this Court. (Doc. 8.); *see* § 3161(c)(1); *United States v. Zerbe*, 596 F. Supp. 2d 267, 269 (D. Conn. 2009) ("[T]he 70-day speedy trial requirement does not begin to run until the *later* of either the date of indictment or his first appearance before a judicial officer of the court."). But the 70-day countdown was immediately stopped because Attorney Sherrer asked for 60 days to file any relevant motions. (Doc. 9 at 3.) The Court granted the request and stated in its Criminal Pretrial Scheduling Order that, in the ends of justice, those days would not be counted against the 70-day period. (*Id.* at 4 (citing 18 U.S.C. § 3161(h)(7)(A)).)[9]

Subsequently, on September 24, Attorney Sherrer moved for an additional 30 days to file motions (Doc. 11); the Court granted this motion and again, in the

---

[9] Although not reflected in the written Pretrial Scheduling Order, a review of the Court's recording of the July 24, 2012 arraignment reveals that the Magistrate Judge made specific oral factual findings on the record to support the § 3161(h)(7) exclusion, focusing upon the nature and seriousness of the offenses charged in the Indictment and the need for counsel to investigate the history and background of Harris, including his prior criminal history.

interests of justice, stopped the 70-day clock during this 30-day period. (Doc. 12 at 1 (citing 18 U.S.C. § 3161(h)(7)(A)).) Sherrer did not file any motions by the expiration of this additional 30-day period, which ended on October 24, 2012. Thus, from the time of Harris's arraignment on July 24, 2012, to October 24, 2012, no time was counted against the 70-day period. *See* 18 U.S.C. § 3161(h)(7)(A)

The clock would have begun running on October 25, however, on October 29, Attorney Sherrer sought a 15-day extension of time for filing motions. (Doc. 13.) On October 30, the Court granted Sherrer's motion and retroactively applied the 15-day extension from October 24 to November 13 in the ends of justice. (Doc. 14 at 1–2 (citing 18 U.S.C. § 3161(h)(7)(A)).) The 15 days Attorney Sherrer requested for adequate preparation ended on November 13, 2012, without any motion being filed, so the speedy trial clock began running on November 14. The clock continued running until December 16, 2012, the day before Harris appeared in court for a pretrial conference. That day, December 17, 2012, is excluded from the 70-day period under 18 U.S.C. § 3161(h)(1) because it is a "delay resulting from other proceedings concerning the defendant." *Id.; see also United States v. Lucky*, 569 F.3d 101, 107 (2nd Cir. 2009). The clock then restarted and ran until January 6, 2013, two days before the Court arraigned Harris on the Superseding Indictment on January 8, 2013. (Doc. 26.) At the arraignment, the Court granted Attorney Sherrer's request to continue the jury draw for 30 days to file motions and, in the interests of justice, again stopped the speedy trial clock. (*Id.*) At this point, the clock had run for 53 days total—from

November 14, 2012 to January 6, 2013, excluding the day of Harris's pretrial conference. That left 17 days on the speedy trial clock.

The speedy trial clock remained stopped until Harris's trial. The clock was scheduled to begin running again on February 8, 2013, but before that date, the government filed an unopposed motion to exclude the time from February 6 to March 6, 2013, when Harris's trial was scheduled to begin. (Doc. 28.) The Court granted this motion in the ends of justice. (Doc. 29 at 1–2 (citing 18 U.S.C. § 3161(h)(7)(A)).) Then, Attorney Sherrer moved to continue the jury draw, (Doc. 30); the Court granted the motion and stopped the speedy trial clock until April 2, 2013. (Doc. 31 at 1–2.) Then, on April 1, 2013, Sherrer filed a motion to inspect presentence reports of coconspirators. (Doc. 44.) This motion, along with two motions in limine filed on April 4 and April 5, (Docs. 45, 47), automatically stopped the speedy trial clock until the Court resolved the motions on April 9, 2013. *See* 18 U.S.C. § 3161(h)(1)(D) (excluding "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion"). Harris's trial commenced on April 9, with the jury draw. (Doc. 56.) Thus, from January 8 to April 9, 2013, the speedy trial clock remained stopped. As a result, there were still 17 days remaining when Harris went to trial.

Given that the STA's 70-day period did not expire, Harris cannot establish that he was prejudiced by Attorney Sherrer's failure to file a motion alleging that the STA was violated. *See Strickland*, 466 U.S. at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

30

proceeding would have been different.").  Nor can Harris prove that Sherrer rendered

less than reasonable representation for failing to advance a meritless argument.

*Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009) ("The law does not require counsel to

raise every available nonfrivolous defense."); *Mayo v. Henderson*, 13 F.3d 528, 533 (2d

Cir. 1994) ("[I]t is not sufficient for the habeas petitioner to show merely that counsel

omitted a nonfrivolous argument, for counsel does not have a duty to advance every

nonfrivolous argument that could be made."); *Acha v. United States*, 910 F.2d 28, 32

(1st Cir. 1990) ("Trial counsel was under no obligation to raise meritless claims.

Failure to do so does not constitute ineffective assistance of counsel.").  As a result,

Harris cannot prove either prong of *Strickland* and his ineffective-assistance claim

relating to the STA must be denied.

### 3.    Sixth Amendment Right to a Speedy Trial

Harris also contends that his Sixth Amendment right to a speedy trial was

violated by the "8 ½ months" between his arraignment and the start of his trial.  (Doc.

106 at 11.)  According to him, Attorney Sherrer's failure to raise this Sixth

Amendment violation was objectively unreasonable representation that prejudiced

him.  (*Id.* at 12.)  But the length of time prior to his trial did not violate the Sixth

Amendment and, as a result, Harris cannot demonstrate prejudice, let alone

objectively unreasonable representation.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused

shall enjoy the right to a speedy and public trial."  U.S. Const. amend. VI.  The right is

"triggered by arrest, indictment, or other official accusation," *Doggett v. United States*,

505 U.S. 647, 655 (1992), or by the unsealing of a sealed indictment, *United States v. Watson*, 599 F.2d 1149, 1156 (2d Cir. 1979). The Supreme Court has identified four factors to consider when evaluating a defendant's allegation that his or her Sixth Amendment right to a speedy trial has been violated: "(1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right to a speedy trial; and (4) the prejudice caused by the delay." *Zerbe*, 596 F. Supp. 2d at 271 (citing *Barker*, 407 U.S. at 530). These factors must be considered together, none of the four factors is either necessary or sufficient on its own to find a deprivation of the right to a speedy trial. *Barker*, 407 U.S. at 533; *see also Davis v. Kelly*, 316 F.3d 125, 127 (2d Cir. 2003). Courts must balance the factors carefully, always "with full recognition that the accused's interest in a speedy trial is specifically affirmed in the Constitution." *Barker*, 407 U.S. at 533.

The first factor operates as a "triggering mechanism" which provokes judicial inquiry into the reasons for and effects of the delay. *Barker*, 407 U.S. at 530 ("Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance."). Here, the length of the delay—eight and a half months—may be on the margins of being "presumptively prejudicial." *Id.* For example, in *United States v. Vassell*, the Second Circuit noted that "[o]ne commentator discerns a general consensus that a delay of over eight months meets this standard, while a delay of less than five months does not." 970 F.2d 1162, 1164 (2d Cir. 1992); *but see Doggett*, 505 U.S. at 652 n.1 (suggesting that delay approaching one year was "presumptively prejudicial"); *Barker*, 407 U.S.

at 534 (noting ten months in jail prior to trial had minimal prejudice). Assuming

arguendo that this delay is presumptively prejudicial, the remaining *Barker* factors do

not favor Harris.

Most significantly, *Barker*'s second factor—the reason for the delay—weighs

heavily against Harris. As indicated in Attorney Sherrer's Affidavit, almost all of the

delay leading up to the trial was caused by the following: "numerous plea discussions.

. . between September 2012 and March 2013," (Doc. 115 at 2, ¶ 13); "[n]umerous

pre[]trial motions and pleadings," (*id.* at 3, ¶ 16); and, after the first jury saw Harris

shackled, Sherrer's request to continue the trial (*id.* at 5–6, ¶¶ 34–36). Thus, much of

the delay was attributable to Harris; this delay is generally not a factor in the Sixth

Amendment analysis. *Vermont v. Brillon*, 556 U.S. 81, 90 (2009). Further, any

additional delay served a legitimate government purpose, it was used to attempt to

negotiate a plea deal and to gather evidence and collect witnesses to prosecute the

complex conspiracy case against Harris. *Doggett*, 505 U.S. at 656 ("The government

may need time to collect witnesses against the accused, oppose his pretrial motions,

or, if he goes into hiding, track him down."); *Vassell*, 970 F.2d at 1165 (concluding

seven-month delay was valid where it was used to negotiate plea deal and secure

cooperation of codefendant). In short, there is no evidence that the government

deliberately attempted to delay the trial, *see Barker*, 407 U.S. at 531; instead, all of

the evidence points to valid reasons for the delay. *Id.*

Similarly, the third factor—the defendant's assertion of the right to a speedy

trial—weighs against Harris. As indicated above, Attorney Sherrer agreed to the

majority of the delays and continuances for the purposes of plea negotiations and to adequately prepare his defense of Harris. (Doc. 115 at 2, ¶¶ 12–13; *id.* at 5–6, ¶¶ 34–37.) At all times, Sherrer relayed the necessity of these delays to Harris and kept Harris informed of their impact on his speedy trial rights. (*Id.* at 5–6, ¶¶ 34–38.) Indeed, Harris acknowledged, on the record, his understanding that "any time that was afforded to the government does not, like, go against my speedy trial time . . . and the time for me to have to go to trial, . . . like motion practice or whatever." (Doc. 97 at 48.) Thus, Harris understood and received benefits from the delay, which weighs against a finding that his right to a speedy trial was violated. *Zerbe*, 596 F. Supp. 2d at 273; *see also United States v. Anderson*, 902 F.2d 1105, 1110 (2d Cir. 1990) (finding no speedy trial violation where "[t]he record indicates that defense counsel agreed to delays and continuances for purposes of plea negotiations").

Finally, no evidence demonstrates that Harris's defense was impaired because of the delay. *United States v. Moreno*, 789 F.3d 72, 81 (2d Cir. 2015) (citing *Barker*, 407 U.S. at 532). In fact, Harris concedes that he cannot demonstrate prejudice, stating that his "position is that the first three *Barker* factors all weigh heavily against the court and, therefore, he does not have to show prejudice." (Doc. 106 at 11.) As described above, however, the other factors do not support his claim. While it is true in "exceedingly rare instances" that the other factors may support a showing of prejudice without the defendant being required to point to "particularized trial prejudice," this is not one of those cases. *See Moreno*, 789 F.3d 72, 82 ("Unquestionably, the ten-month delay attributable to the government here cannot

2:12-cr-00065-wks    Document 121    Filed 02/27/18    Page 35 of 58

sustain a Sixth Amendment claim absent some additional compelling circumstance, such as bad faith by the prosecution or actual prejudice." (internal quotation marks omitted).) Given that the other *Barker* factors weigh against Harris's speedy trial claim, his failure to demonstrate prejudice completely undercuts his Sixth Amendment claim.

Harris's inability to point to any prejudice from the delay dooms the second prong of his ineffective assistance of counsel claim. *See Strickland*, 466 U.S. at 694. Similarly, because his Sixth Amendment argument is meritless, Harris cannot establish that Attorney Sherrer's performance fell below a reasonable standard of performance. *See Knowles*, 556 U.S. at 127. Thus, Harris cannot establish that Attorney Sherrer provided ineffective assistance by failing to raise a Sixth Amendment claim.

### C.    Plea Advice

Harris's second ineffective-assistance claim is that "defense counsel provided erroneous advice regarding [his] ability to plea[d] guilty in open court." (Doc. 106 at 12.) Harris alleges that, if his counsel had provided correct information regarding the "option of [an] open plea" of 5–40 years, he would have pleaded guilty. But Harris's contention is belied by the record, which demonstrates that no "open plea" agreement was offered by the government. It was not ineffective representation for Attorney Sherrer to fail to convey a plea offer that was never extended.

Effective assistance of counsel includes "the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to

the accused." *Missouri v. Frye*, 566 U.S. 134, 145 (2012); *see also Pham v. United States*, 317 F.3d 178, 183 (2d Cir. 2003) ("[T]here is no dispute that failure to convey a plea offer is unreasonable performance." (emphasis omitted)). To prevent such an ineffective-assistance claim from being "late, frivolous, or fabricated," the petitioner should support his or her claim with formal plea offers, which entail documented terms and recorded processing methods, "so that what took place in the negotiation process becomes more clear if some later inquiry turns on the conduct of earlier pretrial negotiations." *Frye*, 566 U.S. at 146; *see also Pham*, 317 F.3d at 181 (noting petitioner's Freedom of Information Act request revealed global plea bargain). In other words, to establish that an attorney's performance was unreasonable, the petitioner must offer credible, objective evidence of the plea deal that the attorney failed to convey. *Pham*, 317 F.3d at 185 (remanding for district court to review the record and to determine whether there was deficient performance). On the other hand, objective evidence is not necessary to establish prejudice, as long as there is a significant sentencing disparity between the alleged plea offer and the imposed sentence and the petitioner states that he would have accepted the plea offer. *Id.* at 183.

There is no evidence that the government ever extended an "open plea" offer to Harris. Attorney Sherrer's Affidavit indicates that, from the beginning of plea negotiations in September 2012, the government "took a relatively hard line" based on Harris's criminal record and its belief that the heroin and crack cocaine distributed by Harris resulted in a man's death. (Doc. 115 at 2, ¶ 13; *id.* at 8, ¶ 47.) As a result, the

government made it clear to Attorney Sherrer that if Harris wished to enter into a plea agreement, Harris would be compelled to plead guilty with a 10-year mandatory minimum term of imprisonment. (*Id.* at 8, ¶ 48.)

To reach this minimum threshold, the government offered two formal plea agreements, which were submitted to this Court. (*See* Docs. 115-6, 115-7.) Under the first, Harris would plead guilty to conspiring to distribute heroin and 28 grams or more of cocaine base in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B). (Doc. 115-6 at 1, ¶ 1.) Combined with the sentencing enhancement imposed under 21 U.S.C. § 841(b)(1)(B) for a prior felony drug conviction, this offer exposed Harris to a 10-year mandatory minimum. (*Id.* ¶ 2.) The second plea offer also exposed Harris to a 10-year mandatory minimum; the offer retained the conspiracy-to-distribute charge but removed the § 841(b)(1)(B) sentencing enhancement in favor of a count for possessing a firearm in furtherance of a drug trafficking crime under 18 U.S.C. § 924(c)(1)(A)(i), which imposed a consecutive five-year mandatory minimum. (Doc. 115-7 at 1–2, ¶ 2.) Attorney Sherrer engaged in a significant effort to persuade the government to extend a more favorable offer to Harris, but the government refused to change the formal plea offers. (Doc. 115 at 10, ¶¶ 54, 56; Doc 116-3.) In short, nothing in the record demonstrates that an "open plea" offer was made by the government or that the government was willing to agree to a plea deal without a 10-year mandatory minimum.

Against this evidence, Harris submits no countervailing proof that an open plea agreement of 5 to 40 years was ever offered by the government. (Doc. 106 at 12–13.)

To the extent that Harris argues that he missed an opportunity to plead guilty to the original Indictment that claim is meritless. (*Id.* at 13.) He apparently contends that, because the first Indictment did not contain the charge for possessing a firearm in violation of 18 U.S.C. § 924(c)(1)(A)(i),[10] Attorney Sherrer should have advised him to plead guilty immediately upon arraignment, thus avoiding the five-year consecutive mandatory minimum imposed under § 924(c)(1)(A)(i). (Doc. 106 at 13.) This advice would not have been effective representation by Attorney Sherrer as Harris's theory overlooks a critical point. Regardless of when the government added the § 924(c)(1)(A)(i) charge, the government could have filed a notice of a prior conviction under 21 U.S.C. § 851(a)(1) at any time "before trial, or before entry of a plea of guilty." Thus, given that the government was intent on securing a 10-year mandatory minimum, (*see* Doc. 115 at 2, ¶13; *id.* at 8, ¶ 47), the government could have filed a notice of a prior conviction before any plea was entered on the original Indictment. (Doc. 115-6 at 1, ¶¶ 1, 2.)

Because there is no evidence that an open plea was offered and Harris's arguments to the contrary amount to mere speculation, Harris cannot meet his burden to establish that Attorney Sherrer's representation was deficient.

### D.    Suppression of Witness Identification

Harris next alleges that Attorney Sherrer did not understand the applicable law governing improper identification methods and that, as a result, Sherrer failed to file a motion to suppress an unnecessarily suggestive identification procedure. (Doc.

---

[10] As noted above, that count was not charged until the grand jury returned the Superseding Indictment on January 3, 2013. (Doc. 20 at 7.)

106 at 14–16.)  Specifically, Harris attacks Andrew Miller's out-of-court identification of Harris as "Black."  According to Harris, this identification was "the one and only identification that brought [him] into focus" and suppressing the testimony would have changed the trial's outcome.  (*Id.* at 15.)  But Harris's claim is barred by the mandate rule and, in any case, is without merit.

### 1.    Mandate Rule

Like his speedy trial claims, Harris's claim that Attorney Sherrer failed to move to suppress the improper identification procedures is barred by the mandate rule.  In his *pro se* appellate brief, Harris specifically attacked the out-of-court identification procedure employed by the police when Miller identified Harris, arguing that "law enforcement used a photographic identification procedure that was impermissibly suggestive."  Appellant's Pro Se Supplemental Brief, *Harris*, 598 F. App'x 44 (No. 14-458, ECF No. 60 at 37).  As described above, the Second Circuit noted in its summary order that this claim, along with Harris's other *pro se* claims, was "without merit." *Harris*, 598 F. App'x at 45 n.2.  Therefore, because the issue regarding the photo identification procedure was "raised and considered on direct appeal," Harris's attempt to relitigate the matter on collateral review is barred by the mandate rule. *See Yick Man Mui*, 614 F.3d at 55; *Pitcher*, 559 F.3d at 124.

### 2.    Suggestive Identification Procedures

Contrary to Harris's allegations, moreover, the record clearly reveals that Attorney Sherrer correctly understood the applicable law relating to suggestive identification procedures and that, under that law, a motion to suppress the witness's

identification was neither meritorious nor would have changed the trial's outcome. Thus, Harris cannot establish ineffective assistance of counsel.

"In order to show ineffective assistance for the failure to make a suppression motion, the underlying motion must be shown to be meritorious, and there must be a reasonable probability that the verdict would have been different if the evidence had been suppressed." *United States v. Matos*, 905 F.2d 30, 32 (2d Cir. 1990) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 375–76 (1986)). The motion at issue here is a motion to suppress identification evidence.

Generally, a defendant has a due process right to suppress identification evidence if the identification procedures were "unnecessarily suggestive and conducive to irreparable mistaken identification." *Stovall v. Denno*, 388 U.S. 293, 302 (1967), *abrogated on other grounds by Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 87 (1993). Where a witness independently identifies the defendant at trial after a pretrial identification by photograph, the Supreme Court has said that the conviction will be set aside "only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S. Ct. 967, 971, 19 L. Ed. 2d 1247 (1968). With this directive in mind, the Second Circuit employs a "two-part inquiry for determining whether pretrial identification procedures tainted an in-court identification." *Echevarria-Perez v. Burge*, 779 F. Supp. 2d 326, 334 (W.D.N.Y. 2011). First, the court must determine if the pretrial identification procedures "unduly and unnecessarily suggested that the defendant was the

perpetrator." *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001). If the court answers this first question in the affirmative, the court must "must then determine whether the identification was nonetheless independently reliable." *Id.* The independent reliability of the identification is examined based on the totality of the circumstances, *Echevarria-Perez*, 779 F. Supp. 2d at 334, including whether the witness had "sufficient familiarity" with the defendant so as to render the identification independently reliable. *Id.* at 336; *see also Neil v. Biggers*, 409 U.S. 188, 199 (1972) (stating that the central question was whether the "'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive.").

In this case, the witness, Miller, cooperated with the government pursuant to a plea agreement. (Doc. 85 at 29–35.) Prior to trial, Miller twice identified Harris from photographs. The first time, on March 27, 2012, Miller was shown a single photograph taken from a seized iPad and he was asked if he could identify the man in the photo. (Doc. 116-1 at 58.) He identified the man as "Black," an alias that Harris used. (*Id.* at 58–59.) The second identification occurred as part of a photo lineup given to Miller on April 16, 2012; Miller identified the photo of Harris as "Black" in the lineup. (*Id.* at 58 n.4; Doc. 32 at 15; Doc. 32-5.) As described above, prior to trial, Attorney Sherrer challenged the second identification on the basis that the government had not disclosed how it acquired the photo of Harris for the photo array; but Sherrer did not challenge the constitutionality of the lineup itself. (Doc. 32 at 15–16.) The Court denied Attorney Sherrer's request for further information relating to the government's acquisition of the photo. (Doc. 41 at 16–17.)

Nothing suggests that either pretrial identification was "unduly and unnecessarily" suggestive. *Raheem*, 257 F.3d at 133. Harris appears to focus on "the single photo identification" and argues that the identification should have been challenged in a suppression hearing. (Doc. 106 at 15.) But he cites no authority for the proposition that the Government's use of a single photo from the seized iPad was unduly suggestive. (*See generally id.*) It is true that the Second Circuit has "consistently condemned the exhibition of a single photograph as a suggestive practice," *Mysholowsky v. People of State of N.Y.*, 535 F.2d 194, 197 (2d Cir. 1976), but that condemnation arises from the concern that a single photo may improperly influence a witness's identification of an unknown perpetrator based solely on the witness's observation of the crime. *Cf. United States v. Stanley*, No. 09-CR-0141(NGG), 2009 WL 5066864, at *4 (E.D.N.Y. Dec. 22, 2009) ("[S]ingle-photo identifications are admissible if used under non-suggestive or exigent circumstances."). Where the witness was an active coconspirator, however, as Miller is in this case, the concern with unduly influencing the witness with a single photo is not as present. *Id.* ("[U]nlike the typically improper situation in which a bystander is asked to identify an otherwise-unknown perpetrator based solely on observation at the time of the crime, [this] was a co-conspirator and had spent one to two days with the defendant prior to the identification.").

Even if this process had been found to be unduly suggestive, Miller's identification of Harris at trial was independently reliable. *Echevarria-Perez*, 779 F. Supp. 2d at 336 ("Even if the photographic array was suggestive . . . the in-court

identifications nevertheless were independently reliable."). Miller testified that, when

he got out of prison in July 2011, he returned to his home in the Bronx, where he met

"Black," who he had known for a "couple of years." (Doc. 85 at 35–36.) According to

Miller's testimony, "Black" told Miller that they could make money selling drugs in

Barre, Vermont. (*Id.* at 36.) Miller then explained that he and "Black" began

traveling to Barre to sell heroin and crack cocaine. (*Id.* at 37–38.) They took multiple

trips by bus for this purpose. (*Id.* at 39–41.) Finally, in the course of his testimony,

Miller identified "Black's" voice on a recording, identified "Black" in a video, and

identified "Black" as Harris in the courtroom. (*Id.* at 58, 67, 68.)

   This testimony established that Miller had "sufficient familiarity" with Harris,

also known as "Black," "so as to render [his] identification independently reliable."

*Echevarria-Perez*, 779 F. Supp. 2d at 336; *see Espinal v. Duncan*, No. 00 Civ.

4844(RWS), 2000 WL 1774960, at *3 (S.D.N.Y. Dec. 4, 2000) (in-court identification

was valid despite use of single photograph where trial court found an independent

source of reliability, "namely that [the witness] already knew [petitioner] by first

name as well as street name, . . . knew where [petitioner] lived and the car he drove,

and had seen him at least 20 times in the prior year." (internal quotation marks and

last alteration omitted)). Indeed, the factors identified by the U.S. Supreme Court in

*Neil v. Bigger* strongly suggest that Miller's in-court identification was reliable.

409 U.S. at 199–200. Given Miller's extended interaction with Harris, Miller had

more than enough opportunity to view Harris with a sufficient degree of attention,

which was confirmed by his level of certainty at trial. *See id.* at 199. Moreover,

although Miller never provided a description of Harris, *cf. id.*, "his independent ability to identify [Harris] was demonstrated in an even more convincing manner: he provided his name." *Wiggins v. Greiner*, 132 F. App'x 861, 865 (2d Cir. 2005). In short, there is scant reason to think that the allegedly suggestive photo display improperly influenced Miller's trial identification of Harris and resulted in a "very substantial likelihood of irreparable misidentification." *See also Simmons*, 390 U.S. at 384. Rather, it was Miller's own memory and knowledge of Harris that served as the basis for the in-court identification. *See Wiggins*, 132 F. App'x at 866. Based on this independent reliability, any motion to suppress Miller's identification would have been unlikely to succeed.

Even if a motion to suppress Miller's identification testimony was meritorious— which is not the case here—a successful motion would not have changed the outcome of the trial. *Matos*, 905 F.2d at 32. Three other witnesses identified Harris as "Black" during the trial: Rebecca O'Neill, (*see* Doc. 84 at 29–30); John Wiley, (*id.* at 93–94); and Lisa Barbour. (*Id.* at 157.) In addition, Detective Shawn Loan, testified that a fourth witness, Sarah Lucas, had identified Harris as "Black" from a photographic lineup. (Doc. 83 at 160–161.)[11] Given this overwhelming testimony, there was compelling evidence aside from Miller's testimony to demonstrate that Harris was the individual known as "Black." As a result, there is no "reasonable probability that the verdict would have been different if [Miller's identification] had been suppressed." *Matos*, 905 F.2d at 32.

---

[11] Sherrer did challenge the out-of-court identification by Sarah Lucas (Doc. 55); his motion to suppress was denied after a hearing. (*See* Docs. 60, 83.)

Based on the foregoing, a motion to suppress Miller's identification would not have been meritorious nor would it have changed the trial's outcome; thus, Harris cannot establish that his counsel's representation was ineffective.

### E.    Failure to Challenge Prior Conviction

Harris's final ineffective-assistance claim is that Attorney Sherrer failed to investigate and challenge his 2008 felony drug convictions for violating New York Penal Law § 220.44(2) and § 105.10(1).  (Doc. 106 at 18; *see also* PSR at 17, ¶ 54; Doc. 17.)  According to Harris, if Attorney Sherrer had investigated these state convictions, he would have discovered that the convictions were "waived by order of New York state court" in approximately 2009 and that, as a result, the 2008 convictions could not have been used to impose a 10-year mandatory minimum under 21 U.S.C. §  841(b)(1)(B) and § 851.  (Doc. 106 at 19; *see also* PSR at 17, ¶ 54; *id.* at 18, ¶ 59; *id.* at 22, ¶ 83.)[12]  But Harris presents no evidence that his counsel failed to investigate these convictions, or even that the convictions were in fact "waived" by any court.  (*See generally* Doc. 106 at 18–19.)  As a result, he cannot demonstrate that Attorney Sherrer provided ineffective assistance.

During post-trial sentencing proceedings, counsel may provide less than competent representation under *Strickland*'s first prong if he or she fails to challenge the computation of a defendant's sentence in the PSR.  *Johnson v. United States*, 313 F.3d 815, 818 (2d Cir. 2002) ("[T]rial counsel's representation fell below the 'range of

---

[12]  As described below, the Court concluded that Harris's admission to the prior conviction satisfied 18 U.S.C. § 851 and imposed a 10-year mandatory minimum based on this prior conviction; however, the Court did not adopt the PSR's recommendation to classify Harris as a career offender. (Doc. 94 at 11.)

competence demanded of attorneys' when he failed to challenge the PSR's computation of petitioner's offense."). Similarly, if counsel does not adequately investigate the basis for a sentencing enhancement, this may amount to ineffective assistance of counsel. *Beard,* 545 U.S. at 389 (concluding, in capital case, that it was unreasonable for defense lawyer to fail to examine defendant's prior-conviction file). That ineffective representation prejudices the defendant if there is a reasonable probability that the sentence would have been lower absent the challenged computation or sentencing enhancement. *Johnson*, 313 F.3d at 818; *Glover v. United States*, 531 U.S. 198, 203 (2001) (holding that "any amount of [increased] jail time has Sixth Amendment significance" and constitutes prejudice under *Strickland*). To establish these prongs, the petitioner must allege specific facts that he "is in a position to establish by competent evidence." *LoCascio*, 395 F.3d at 57.

21 U.S.C. § 841(b)(1)(B) imposes a ten-year mandatory minimum if an offender trafficked in certain drug quantities and has a prior felony drug conviction. (Doc. 106 at 19.) The procedural mechanism for triggering this enhanced sentence is found at 21 U.S.C. § 851(a)(1), which requires the government to file an information with the court "stating in writing the previous convictions to be relied upon." Section 851 also sets forth various processes for challenging the alleged prior convictions, *id.* § 851(c), and for inclusion of the prior conviction in the determination of a sentence. *Id.* § 851(d). As relevant in this case, if an offender admits to the prior convictions during a sentencing colloquy, that admission is sufficient to establish his or her recidivist status. *Id.* § 851(b) ("[T]he court shall after conviction but before pronouncement of

46

sentence inquire of the person with respect to whom the information was filed whether he affirms or denies that he has been previously convicted as alleged in the information."); *cf. Alsol v. Mukasey,* 548 F.3d 207, 211 (2d Cir. 2008) ("If a defendant does not admit his prior conviction, the government must prove the existence of the prior conviction beyond a reasonable doubt." (citing 21 U.S.C. § 851(b))).

During Harris's sentencing hearing, the Court asked him whether he had been convicted in 2008 and Harris admitted to the prior convictions. (Doc. 94 at 228–29.); *see also* 21 U.S.C. § 851(b). As the Court noted at sentencing, (Doc. 94 at 228–29), that is a sufficient confirmation under 21 U.S.C. § 851(b) to establish the prior conviction. *Cf. Alsol,* 548 F.3d at 211. Further, Harris's admission during sentencing was supported by a New York certificate of disposition admitted as an exhibit during the hearing. (*See* Doc. 94 at 137.) This certificate established that, as of February 6, 2013, Harris's 2008 convictions existed on file in the Supreme Court of the State of New York for New York County. (Doc. 82-1.)

Moreover, Attorney Sherrer states in his affidavit that he "did investigate and challenge the 2008 drug convictions" and was unable to obtain any evidence corroborating Harris's present claim. (Doc. 115 at 12, ¶ 63.) As support, Sherrer points to his efforts to obtain the hearing transcripts for the New York state court proceedings concerning Harris's 2008 convictions. (Doc. 115-11.) Similarly, at sentencing, after Harris acknowledged that he was convicted in 2008, Harris claimed that he "received a certificate to [his] house stating that the felony is being took off [his] record." (Doc. 94 at 228–29.) In response, Attorney Sherrer stated that his

previous research had revealed no proof that Harris had received any relief from the 2008 convictions. (Doc. 115 at 13, ¶ 68.) In short, Sherrer's Affidavit and supporting documents demonstrate his continued efforts to challenge Harris's 2008 convictions, despite the high likelihood that his efforts would not succeed.

Against this evidence, Harris points to no evidence showing that his 2008 convictions had been vacated or that Attorney Sherrer neglected to challenge the convictions. *Cf. Dalli v. United States*, 491 F.2d 758, 761 (2d Cir. 1974) ("The petitioner must set forth specific facts which he is in a position to establish by competent evidence."). Instead, he merely states in his motion that "the conviction was void." (Doc. 106 at 19.)[13] This conclusory statement is not sufficient to warrant even an evidentiary hearing on this issue. *Aiello*, 814 F.2d at 113 ("To warrant plenary presentation of evidence, the application must contain assertions of fact that a petitioner is in a position to establish by competent evidence.) Rather, Harris's statements regarding the 2008 convictions are the sort of "[a]iry generalities" and "conclusory assertions" that will not suffice to survive a motion to dismiss his petition. *Id.*

Because Harris can point to no evidence to establish that his 2008 convictions were in fact waived or that his counsel failed to reasonably represent him, he cannot establish ineffective assistance of counsel.

---

[13] In a Reply to the government's response to the § 2255 Motion Harris renews his claim that the conviction was void. (Doc. 120 at 6.) Significantly, Harris again fails to provide any evidence to support his assertion that his state conviction had been vacated. (*Id.*)

### III.    Sentencing Errors

### A.    Application of Sentencing Guidelines

### 1.    Procedural Default

As an initial matter, Harris failed to raise the claim on direct appeal.

Therefore, review is barred by Harris's procedural default.

A § 2255 motion is not a substitute for direct review, *see Zhang v. United States*,

506 F.3d 162, 166 (2d Cir. 2007); thus, if a petitioner fails to properly raise a claim on

direct review that claim will not be considered "unless the petitioner shows (1) good

cause to excuse the default and ensuing prejudice, or (2) actual innocence."

*Harrington v. United States*, 689 F.3d 124, 129 (2d Cir. 2012) (citing *Bousley v. United

States*, 523 U.S. 614, 622).  Harris did not directly appeal any aspect of the application

of the Sentencing Guidelines or the Court's criminal history computation on appeal.

*See generally* Brief for Defendant-Appellant, *Harris*, 598 F. App'x 44 (No. 14-458, ECF

No. 31); *id*. Supplemental Brief, ECF No. 60.  In the instant § 2255 Motion, moreover,

although he recites the correct legal standard, (*see* Doc. 106 at 3), he does not provide

proof of either his actual innocence or good cause for his failure to pursue the appeal

and resulting prejudice.  *Harrington*, 689 F.3d at 129.  As a result, his claim cannot be

collaterally reviewed.

### 2.    Procedural Bar

Further, because Harris did not challenge the application of the Sentencing

Guidelines on appeal, his claim is procedurally barred unless the claimed error

resulted in a "complete miscarriage of justice."  *Graziano v. United States*, 83 F.3d

587, 590 (2d Cir. 1996) ("Insofar as claims regarding a sentencing court's error in failing to properly apply the Sentencing Guidelines are neither constitutional nor jurisdictional, we join several other circuits in holding that, absent a complete miscarriage of justice, such claims will not be considered on a § 2255 motion where the defendant failed to raise them on direct appeal.").  Harris cannot demonstrate that the Court misapplied the Sentencing Guidelines, let alone that such a misapplication resulted in a complete miscarriage of justice; thus, his argument is procedurally barred.

The guideline at issue is USSG § 4A1.1(b), which assigns two criminal history points for "each prior sentence of imprisonment of at least sixty days," as long as the sentence was not counted in § 4A1.1(a).  *Cf. id.* § 4A1.1(a) (stating that three points should be added for "each prior sentence of imprisonment exceeding one year and one month").  If the sentence of imprisonment is less than 60 days and has not been previously counted in either § 4A1.1(a) or § 4A1.1(b), one criminal history point is added.  *Id.* § 4A1.1(c).  All felony offenses are counted as prior offenses, but some specifically enumerated misdemeanor sentences and petty offenses are never counted, *see id.* § 4A1.2(c)(2), while other misdemeanors and petty offenses are counted only if the imprisonment term is at least 30 days or if the instant offense is similar to certain listed offenses, including "[f]alse information to a police officer."  *Id.* § 4A1.2(c)(1)(A)– (B).

Harris was convicted of false personation on January 12, 2004, and a 60-day sentence was imposed. (PSR at 16, ¶ 52.) Thus, based on the length of imprisonment set forth in USSG § 4A1.1(b), the PSR assigned Harris two criminal history points. Attorney Sherrer agreed with this calculation at the sentencing hearing, (Doc. 94 at 157–58), but Harris disputed the actual length of his imprisonment. (*Id.* at 157.) Ultimately, the Court noted that Harris "didn't raise an objection to the two points," (*see id.* at 179), and applied the two points along with five other points, which totaled seven criminal history points and resulted in a CHC of IV. (*Id.* at 185, 237.)

Harris contends that the Court erred by assigning him these two points and that, without the two points, his CHC would have been III. (Doc. 106 at 17–18; *see also* PSR at 16, ¶ 52.) Specifically, Harris maintains that he was in prison less than 60 days, arguing that he "was sentenced to time served" and "that the crime of false impersonation did not carry more than a 30[-]day sentence." (Doc. 106 at 17.) As a result, he claims that he should have received one criminal history point under § 4A1.1(c). (*Id.*) But Harris points to no evidence to support these contentions. *See Triestman*, 470 F.3d at 477 (noting that Courts should not excuse "frivolous" *pro se* arguments). Moreover, as noted in the commentary to USSG § 4A1.2, "criminal history points are based on the sentence pronounced, not the length of time actually served." *Id.* § 4A1.2 cmt. 2.

In the alternative, Harris appears to argue that his "false personation" conviction is similar to the conviction for giving "false information to a police officer" listed in USSG § 4A1.2(c)(1)(B) and that, as result, his prior conviction should be

categorically excluded from being counted. (Doc. 106 at 17.) This argument improperly conflates the two subparts of USSG § 4A1.2(c); instead, under USSG § 4A1.2(c)(1)(A), it is clear that Harris's conviction could not be categorically excluded because the sentence imposed exceeded 30 days.

Perhaps most importantly, the inclusion of the two points arising from the New York conviction did not result in a greater sentence. The Court determined that Harris's exposure under the advisory Sentencing Guidelines was 168–210 months, based on an adjusted offense level of 32 and a CHC of IV. If the New York conviction had been excluded Harris would have faced a range of 151–188 months, based on an offense level of 32 and a CHC of III. The Court, in fact, granted Harris's motion for a non-Guideline sentence and imposed the 151-month sentence, which was later lowered to 135 months as a result of Amendment 782 to the Sentencing Guidelines. Clearly the inclusion of the New York false personation conviction had no role in the determination of the ultimate sentence.

In short, Harris's allegations lack legal and factual support;[14] as a result, he cannot demonstrate that the application of the Sentencing Guidelines resulted in a complete miscarriage of justice and his claim is procedurally barred.

## B.    Resentencing

### 1.    Procedural Default

As with his other sentencing claim, this Court cannot address Harris's claim regarding his resentencing because he failed to challenge the claim on direct appeal.

---

[14] Given the complete lack of legal and factual support for Harris's claim, even if the claim survived the two procedural pitfalls described above, it would not succeed on the merits.

*Zhang,* 506 F.3d at 166 ("In general, a claim may not be presented in a habeas petition where the petitioner failed to properly raise the claim on direct review.").  Moreover, this procedural default cannot be excused because his § 2255 Motion does not provide proof of either "(1) good cause to excuse the default and ensuing prejudice, or (2) actual innocence."  *Harrington*, 689 F.3d at 129 (citing *Bousley*, 523 U.S. at 622.)  As a result, his claim is procedurally defaulted.

### 2.    Sentence Reduction

Even if his claim was not defaulted, there is no merit to Harris's contention that the Court erred when it resentenced him under 18 U.S.C. § 3582(c)(2).  (Doc. 106 at 21.)  Although Harris is correct that the Court did not set forth a detailed discussion of the § 3553(a) statutory factors in resentencing Harris, (*see generally* Doc. 103), even if the Court had explained its reasoning, it would not have resulted in a lower sentence for Harris because he was sentenced to the minimum term available in the amended Guideline range.

Generally, a judgment of conviction that includes a sentence constitutes a final judgment.  18 U.S.C. § 3582(b).  Section § 3582(c)(2) provides for a limited exception to such final judgments "'in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission pursuant to 28 U.S.C. § 994(o)' and made retroactive pursuant to § 994(u)."  *Dillon v. United States*, 560 U.S. 817, 824 (2010) (emphasis omitted) (quoting 18 U.S.C. § 3582(c)(2)).  This is a narrow proceeding, "not a plenary resentencing proceeding."  *Id.* at 826.

In keeping with this restricted proceeding, the Supreme Court has concluded that a court must engage in a two-step procedure when reducing a defendant's sentence pursuant to 18 U.S.C. § 3582(c)(2). *Id.* First, "[a] court must . . . determine that a reduction is consistent with [USSG] § 1B1.10." *Id.* at 827. That guideline— USSG § 1B1.10(b)(2)(A)—prevents the court from "reducing the defendant's term of imprisonment under 18 U.S.C. § 3582(c)(2) . . . to a term that is less than the minimum of the amended guideline range," unless the original sentence was below the Guidelines range. *See also Dillon*, 560 U.S. at 827 (citing U.S.S.G. § 1B1.10). Only after a court "determine[s] the prisoner's eligibility for a sentence modification and the extent of the reduction authorized [under USSG § 1B1.10(b)(2)(A)]," does the Court move on to the second step. *Id.* at 827. As part of this second step, the Court must consider the applicable factors under 18 U.S.C. § 3553(a) "and determine whether, in its discretion, the reduction authorized by reference to the policies relevant at step one is warranted in whole or in part under the particular circumstances of the case." *Id.* In considering the § 3553(a) factors under step two, "the reasons for the district court's exercise of discretion [must be] apparent from the record." *United States v. Christie*, 736 F.3d 191, 196 (2d Cir. 2013).

At Harris's original sentencing hearing, based on the testimony and admitted documents, the Court adopted the PSR recommendation setting Harris's base offense level at 30,[15] (*see* PSR at 11, ¶ 30), and then applied a two-level enhancement for

---

[15] The Court did not adopt the PSR's classification of Harris as a career offender, (Doc. 94 at 237; *cf.* PSR at 14–15, ¶ 45), nor did the Court increase the offense level based upon the threat to use violence. (Doc. 94 at 237; *cf.* PSR at 14, ¶ 40(b).)

Harris's possession of a dangerous weapon, putting his total offense level at 32. (Doc. 94 at 237; *see also* PSR at 14, ¶ 40(a); USSG 2D1.1(b)(1).)  The Court further determined that a "modest adjustment" was appropriate based on the court's review of the 18 U.S.C. § 3553(a) factors and reduced Harris's offense level to 31.[16]  (Doc. 94 at 236, 237.)  For Harris, who was classified as CHC IV, this yielded a recommended sentencing range of 151–188 months.[17]  (*Id.* at 237.)  He was sentenced to 151 months. (*Id.*)

Subsequently, Amendment 782 to the Sentencing Guidelines retroactively amended the drug quantity table in USSG § 2D1.1(c), reducing the offense level for all controlled substance offenses by two levels.  *See* USSG Supp. App. C, Amdt. 782 (effective Nov. 1, 2014); (*see also* Doc. 103 (noting that under 28 U.S.C. § 994(u), Amendment 782 retroactively applied).[18]  This meant that Harris's base offense level was reduced from 30 to 28.  (*Cf.* PSR at 13–14, ¶ 39.)  With the two-level enhancement for firearm possession, Harris's new total offense level was 30.  This yielded a new recommended sentencing range of 135–168 months.  Based on this amended guideline

---

[16]  Because of this one-level decrease to 31, Harris argues that his amended criminal offense level should be 29, after deducting the two-point reduction authorized by Amendment 782, (*see* Doc. 106 at 20); however, the Second Circuit has explicitly held that "the provisions of § 1B1.10 of the Guidelines, as incorporated by § 3582(c)(2), require a resentencing court to apply the amended Guidelines range that would have been applicable to the defendant under the retroactive amendment, without applying any previously[ ]granted departure."  *United States v. Steele*, 714 F.3d 751, 752 (2d Cir. 2013) (emphasis omitted).  Here, the amended Guidelines range set Harris's offense level at 30, without the adjustment the Court granted at sentencing.

[17]  Prior to the one-level decrease to 31, his recommended sentencing range was 168–210 months.  (Doc. 94 at 237.)

[18]  Amendment 782 was promulgated prior to Harris's sentencing hearing on January 30, 2014, and the entry of judgment on February 5, 2014; however, by the terms of USSG § 1B1.10(e)(1), the Court "could not order a reduced term of imprisonment based on Amendment 782 unless the effective date of the court's order is November 1, 2015, or later."

range, the resentencing Court reduced Harris's sentence to 135 months, effective November 1, 2015. (*See* Doc. 103.) Because this was the lowest minimum in the amended range, if the Court had moved on to step two of the inquiry and considered the discretionary sentencing factors set forth in 18 U.S.C. § 3553(a), Harris's sentence would not have decreased. *Dillon*, 560 U.S. at 827; USSG § 1B1.10(b)(2)(A) ("[T]he court shall not reduce the defendant's term of imprisonment under 18 U.S.C. § 3582(c)(2) and this policy statement to a term that is less than the minimum of the amended guideline range.").

It is true that where a court denies a motion for a sentence reduction pursuant to 18 U.S.C. § 3582(c) it must explain its decision in order to permit appropriate appellate review. *Christie*, 736 F.3d at 197. However, the decision in *Christie* arose in the context of a denial of a § 3582(c) motion; as the Second Circuit stated, "[W]e lack any understanding of the reasoning underlying the district court's decision" to deny the motion for a reduction of sentence. *Id.* at 198. Here, the Court granted the relief, stating affirmatively that it had considered the § 3553(a) factors in imposing a new sentence at the low end of a within-Guideline range. No further explanation is required. *United States v. Chavez-Meza*, 854 F.3d 655, 658–59 (10th Cir. 2017), *cert. granted*, – S. Ct. –, 2018 WL 386570 (U.S. Jan. 12, 2018) (No. 17–5639); *cf. Christie*, 736 F.3d at 196 ("The failure to state reasons [for the Court's resentencing actions] will not always require a remand. . . . [T]he reasons for the district court's actions may be obvious from the history of the case.").

## **Conclusion**

For the foregoing reasons, I recommend that Harris's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (Doc. 106) be DENIED.  I also recommend that the government's Motion to Dismiss (Doc. 108) be GRANTED.

Because the Motion and other files and records in this case "conclusively show that [Harris] is entitled to no relief," there is no need to conduct an evidentiary hearing on the motion.  28 U.S.C. § 2255(b).  Nor is there cause for issuance of a certificate of appealability, which may issue in a § 2255 proceeding "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  Generally, a movant meets this burden by demonstrating that "reasonable jurists could debate whether . . . the [motion] should have been resolved in a different manner or that the issues presented [a]re adequate to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted).  Harris has not made this showing, and thus I recommend DENYING any request for issuance of a certificate of appealability.  I further recommend that Harris's request for counsel, (Doc. 106 at 2–3), be DENIED as moot in light of this recommendation.  Furthermore, Harris has no constitutional right to appointed counsel for collateral proceedings.  *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("Our cases establish that the right to appointed counsel extends to the first appeal of right, and no further."); *Carranza v. United States*, 794 F.3d 237, 242 (2d Cir. 2015) ("[T]he constitutional right to the effective assistance of counsel extends to direct appeal, but not to collateral proceedings." (citation omitted)).

Dated at Burlington, in the District of Vermont, this 27th day of February 2018.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge


Any party may object to this Report and Recommendation within 14 days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision." *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).